**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-40705
_____


UNITED STATES OF AMERICA,

                         Plaintiff-Appellee,

              VERSUS

        MICHAEL DEWAYNE ADKISM
                and
    STAFFORD DEWAYNE PATTERSON,

                         Defendants-Appellants.


_____

Appeal from the United States District Court
     for the Eastern District of Texas
                (3:97-CR-4)
_____


April 26, 1999

Before REAVLEY, POLITZ, and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


Michael Adkism and Stafford Patterson raise sufficiency of the evidence and evidentiary challenges related to their convictions of conspiracy to possess cocaine base (crack cocaine) with the intent to distribute and of possession with the intent to distribute. Finding no reversible error, we affirm.

I.

The Regional Drug Task Force and the Mobile Enforcement Team of the Drug Enforcement Administration ("DEA") (collectively, the "team") initiated a narcotics investigation in Paris, Texas, focusing on the distribution of cocaine base. They used confidential informants ("CI's") and undercover officers to purchase drugs, recording many of the transactions on video or audio. The team made numerous buys from most of the numerous co-conspirators named in the indictment, including Michael Adkism, Al Green, and Rodney Thomas, at Record Park, the Westgate apartment complex, and the Razzmatazz Club. They delayed making arrests, however, to maximize the productivity

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

of their undercover work. For example, undercover officer Robert Bridges, accompanied by CI Archie Booker, made one such buy-walk from Adkism at his home. Bridges obtained 7.27 grams of crack (about ¼ of a crack "cookie") for $500, and Adkism indicated that he could sell them more.

As part of the culmination of their efforts, the team planned a buy-bust sting operation in which they intended to purchase one kilo of crack from Green. William "B.B." Block, a/k/a Smokey, a CI working for the DEA, who already had purchased a big 8 (⊂ of a kilo) from Green, set up the deal. Green said he would have to get a price from his supplier, Thomas. They eventually agreed on $20,000.

The team originally planned to carry out the bust at a Holiday Inn room furnished with electronic monitoring devices or in the local Super One parking lot; Green refused both locations. Instead, he chose Johnson, or Martin Luther King ("MLK"), Park. Block picked up Green at Green's house and drove to the park, where they met Thomas.

Thomas had come from his brother Kevin Thomas's house. His associate, Marcus Hooker, had been there with him. Hooker and Thomas originally had planned for Hooker to stage a robbery of Thomas, so they could take the money instead of handing it over to Stafford Patterson, the supplier. They also planned to rob Block of the dope, hence making a double score. Their plans were thrown off, however, when Patterson arrived a day earlier than expected. He showed up at Kevin Thomas's house the day of the bust. Perhaps suspecting foul play, Patterson had Hooker remain at the house while Thomas carried out the deal.

When Block and Green arrived at MLK park, Thomas climbed into Block's jeep to explain how the deal would go down. He said the drugs were in the park; but Block, in an apparent effort to stall for time, informed Thomas that he had to get the money. Thomas waited in his pickup, while Block dropped Green off at his house and met briefly with agents to review the new plan for the bust.

The team converged on the park. Block climbed into Thomas's pickup and told him that the man in a Lexus parked near by was his brother, with the money. The man actually was DEA agent Robert Crawford. Block insisted on seeing the drugs first, and the two men moved into the park. Thomas had become nervous after spotting a white van that he suspected might be law enforcement (It was, in fact, occupied by two DEA agents, who had backed off.). Nonetheless, Thomas soon showed Block a brown paper bag in a trash can that contained a plastic bag full of crack (later determined to be just under 900 grams).

Upon seeing the drugs, Block removed his hatSSa signal that the drugs were there and they could make the arrests; no agent saw the signal. Crawford attempted to call the agents, but his mobile phone did not work. While waiting for backup so the arrests could be made, Crawford stalled Thomas. He showed the money, counted some of it, and argued with Thomas over whether it was all there.

Meanwhile, Hooker had stopped by the Razzmatazz, where he ran into Patterson sitting in his car. Patterson told him that Thomas should be back in 15 to 20 minutes. Hooker proceeded to the park, where he slowly drove past the deal as it took place. He did not intervene.

As time passed, Thomas grew increasingly anxious. Crawford eventually had to hand over all the money. Thomas left in one direction, while Block headed another with the drugs. Thomas came across Hooker as he drove down the street, and they pulled into a parking lot. Hooker told Thomas that earlier he had seen several white men in a car observing the deal in the park. Thomas took off on foot with the money. He eluded authorities for over a week while he blew all the money in a hedonistic spree.

Hooker returned to the Razzmatazz, where he was arrested when drugs happened

2

to fall out of his pocket. The team also arrested Patterson, apparently still in his vehicle. No drugs were found in his car, however, and he was released from jail a few days later after state charges were dropped.

While Patterson was in jail, his wife called co-conspirator Herbert Hill, Jr., to collect money he owed for crack Patterson had fronted him. After being released, Patterson collected $1,200 in drug proceeds from Hill.

Another of Thomas's brothers, Clinton Thomas, had purchased crack from Adkism several times a week in the months preceding the bust. He testified that Adkism became nervous after the bust and briefly left town. He returned, however, and continued selling crack out of his home until arrested on the federal indictment.

## II.

A grand jury returned a twenty-six-count indictment against thirteen defendants. Adkism and Patterson were charged with conspiring with Christopher Burns, Ronnie Davis, John Fisher, Terry Hearn, Aubrey Jenkins, Randy Miles, Green, Hill, Hooker, and other. The grand jury named Thomas as an unindicted co-conspirator. Ten of the co-conspirers pleaded guilty to various charges and several, including Thomas, testified at trial. Thomas said that Patterson supplied him, Adkism, Green, and Hill with crack. They purchased it from Patterson to resell in smaller amounts.

The grand jury returned a five-count superseding indictment against Patterson and Adkism.[1] A petit jury returned a guilty verdict

on counts 1, 2 and 4.

## III.
### A.

The defendants contend that the district court erred in refusing to exclude testimony obtained from co-conspirators pursuant to plea agreements. The court should have excluded this testimony, they aver, because it violates 18 U.S.C. § 201(c)(2), which prohibits giving or promising a witness anything of value in exchange for his testimony. Adkism and Patterson do not seek a new trial but argue that when conducting our sufficiency of the evidence review, we may not consider evidence obtained in violation of the statute.

After the defendants submitted their brief, we decided *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998), and *United States v. Haese*, 162 F.3d 359 (5th Cir. 1998), in which we addressed and rejected the *Singleton* argument[2] raised here. In *Webster*, we reviewed for plain error and found that any error made was not plain. *See Webster*, 162 F.3d at 357-58. In *Haese*, again reviewing for plain error, we went further and rejected the argument altogether. We held that "it is evident to this court that Congress did not intend for section 201(c)(2) to be used when prosecutors offer lenity for a witness' truthful testimony." *Haese*, 162 F.3d at 367. Testimony induced by plea bargains is not illegal. The court did not err in admitting the testimony, and we may consider it here.

---

[1] The grand jury charged both Adkism and Patterson in count 1 with conspiracy to possess a controlled substance, 50 grams or more of cocaine base, with intent to distribute, in violation of 21 U.S.C. § 846. Adkism was charged in count 2 with possession with intent to distribute and distribution of crack cocaine, in violation of 21 U.S.C. § 841(a), and in count 3 with the use of a communication facility to commit a controlled substance offense, in violation of 21 U.S.C. § 843. Patterson was charged in counts 4 (continued...)

(...continued)
and 5 with a violation of 21 U.S.C. § 841, and with distributing and possessing with intent to distribute crack cocaine within 1,000 feet of a playground, in violation of 21 U.S.C. § 860, respectively. The grand jury included a violation of 18 U.S.C. § 2 (aiding and abetting) with each of the five counts. Counts 3 and 5 were later dismissed.

[2] The argument is so named because of *United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), in which the court adopted it. That decision has since been vacated and the case reheard en banc, whereupon the court rejected the notion that testimony obtained via plea agreements violates § 201(c)(2). *See United States v. Singleton*, 165 F.3d 1297 (10th Cir. 1999) (en banc).

### B.

Adkism and Patterson contend that the government presented insufficient evidence that they conspired to possess crack cocaine with the intent to distribute it. They raise both legal and factual sufficiency challenges.

### 1.

"Our review for sufficiency of the evidence following a conviction is narrow."[3] We view the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to the verdict. *See United States v. Burton*, 126 F.3d 666, 669 (5th Cir. 1997). Ordinarily, we must affirm if a rational trier of fact could have found that the government proved the offense's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Burton*, 126 F.3d at 669. The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence. *See id.*; *Westbrook*, 119 F.3d at 1189.

The defendants moved for a judgment of acquittal at the end of the government's evidence but failed to renew the motion at the close of their evidence. In these circumstances, our review is even more narrow: We will reverse only if a conviction results in a manifest miscarriage of justice. *See United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998); *United States v. Inocencio*, 40 F.3d 716, 724 (5th Cir. 1995). "Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *Inocencio*, 40 F.3d at 724 (quoting *United States v. Pierre*, 958 F.2d 1304, 1310 (5th Cir. 1992) (en banc)).

### 2.

To obtain a conviction of conspiring to violate the drug laws under 21 U.S.C. § 846, the government must prove (1) an agreement between two or more persons to violate the drug laws, (2) that each alleged co-conspirator knew of and intended to join the agreement, and (3) that each co-conspirator voluntarily participated in the agreement.[4] An express agreement is not required; a tacit agreement suffices. *See Westbrook*, 119 F.3d at 1189. The elements may be established by circumstantial evidence. *See id*. The agreement "may be inferred from concert of action. Knowledge of the conspiracy may be inferred from a collection of circumstances." *Dixon*, 132 F.3d at 201. "[V]oluntary participation may be inferred from a development and collocation of circumstances." *Id*. (quotation omitted).

A guilty conspirator "need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy." *Westbrook*, 119 F.3d at 1189. A jury may convict "where a pivotal figure directs and organizes the illegal activity, and has extensive dealings with each of the parties. Thus, parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy, even in the absence of contact with other conspirators." *Inocencio*, 40 F.3d at 725 (quotations and citations omitted). If the government has established the existence of an illegal conspiracy, then "it need only introduce slight evidence to connect an individual defendant to the common scheme." *Westbrook*, 119 F.3d at 1190 (internal quotation marks omitted).

One who aids and abets an offense may be punished as a principal. *See Burton*, 126 F.3d at 670. To obtain a conviction of aiding and abetting, the government must

---

[3] *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1059, *and cert. denied*, 118 S. Ct. 1060 (1998) (citing *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)).

[4] *See United States v. Dixon*, 132 F.3d 192, 201 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 1581 (1998); *Westbrook*, 119 F.3d at 1189; *Inocencio*, 40 F.3d at 725.

prove "that the defendant (1) associated with the criminal venture; (2) participated in the venture; and (3) sought by action to make the venture succeed." *Id.*

3.

Patterson and Adkism attack the evidence as insufficient to establish a conspiracy. The thrust of their argument appears directed at the first prongSSthe agreement. They claim that the evidence shows "there was a lack of an agreement to do anything but look out for themselves while they were individually selling drugs." But, contrary to their assertion, substantial evidence supports the existence of a tacit agreement for Patterson to supply crack cocaine to other dealers, who would in turn sell it. Furthermore, the evidence supports the jury's implicit finding that those other dealers had a tacit arrangement to supply each other with drugs if and when they ran out.

The district court rejected the defendants' motion for acquittal, citing the following evidence:

> Going through the testimony here, Juan Council testified that he bought crack cocaine from both Defendants. Aubrey Jenkins, who is named in the Indictment as one of the alleged co-conspirators, testified that he bought from Mr. Adkism and that the sellers of crack in Paris supported each other by supplying each other when they ran short.

Al Green testified about his role in the delivery on January 16, 1997, at Johnson Park and his participation with the Government Informant Smokey, who turned out to be William Block. Al Green also testified that he once traded a shotgun for crack cocaine from Stafford Patterson in 1995. William Block, the Confidential Informant, testified about his actions on January 16, 1997, involving the kilogram transaction with Rodney Thomas.

Rodney Thomas then testified that Stafford Patterson fronted crack cocaine to him, that he once accompanied Stafford Patterson to Herb Hill's house to pick up money for crack cocaine. Herb Hill is one of the alleged co-conspirators in the Indictment. He also testified that he had an understanding with Michael Adkism to supply each other if they ran short of crack cocaine. Rodney Thomas further testified that on January 16, 1997, that he talked to Stafford Patterson about buying the kilogram of crack cocaine and about the price. He went with Stafford Patterson to Al Green's to discuss money. Later Stafford Patterson, according to Rodney Thomas, gave Rodney Thomas the kilogram of cocaine that he obtained from the Dillards' house. And finally, Rodney Thomas testified that there was a sort of agreement that Stafford Patterson would supply Rodney Thomas, Michael Adkism, Herb Hill, and others

5

with crack cocaine.

Marcus Hooker testified that he got his crack from Rodney Thomas, that Rodney Thomas told him that the crack came from Patterson, that Patterson once offered Marcus Hooker drugs in return for jumping on someone. Herb Hill testified that he got his crack from Stafford Patterson in order to resell it. And, by the way, Marcus Hooker, is one of the named co-conspirators in the Indictment. Herb Hill also testified that he was with Patterson when Patterson delivered crack to Michael Adkism. He testified that Patterson fronted Rodney Thomas and Chris Burns with crack. Finally, Clinton Thomas testified that he had bought crack cocaine from Stafford Patterson, that he also bought it from Michael Adkism, and that Adkism said he got his crack from Stafford Patterson.

This evidence provides an ample basis for the jury to accept the government's theory of the case. Patterson and Adkism point out weaknesses in the testimony of these same witnesses. For example, they emphasize that Council, Jenkins, Hooker and Fisher denied any agreement or network. The evidence, however, allowed the jury to conclude that Patterson conspired with Adkism, Thomas, and others to distribute crack cocaine. The jury also could have found a tacit, if not explicit, agreement among the dealers to supply each other when they ran short. The argument that they acted independently must fail.[5]

Patterson and Adkism rely heavily on the lack of credibility of the co-conspirators who testified against them. The argument appears directed at the alleged illegality of the testimony, which we already have rejected. To the extent the defendants seek to impugn their credibility for our sufficiency of the evidence review, arguing their testimony "should be discounted," we disagree. The appellants had an opportunity before the jury to raise questions about the witnesses' credibility, and they did just that by asking about the plea agreements and prior records. The jury must have resolved credibility determinations, which are theirs to make, in favor of the government.[6]

Patterson also attacks the testimony of the officers who worked on the case, emphasizing that not one of them provided direct evidence linking him to the drug deals that the officers witnessed. Yet, their testimony substantiated the relationships between other dealers and the existence of a conspiracy. Once the government establishes the conspiracy, it needs to provide only slight credible evidence linking Patterson to it. The testimony of numerous co-conspirators implicating Patterson as the source of the crack more than suffices to uphold his conviction.

C.

The defendants style their third argument as a variance between the indictment, charging a single conspiracy, and the proof at trial, establishing multiple conspiracies, if any. They fail, however, to provide any legal analysis. Their brief is devoid of even a single citation to a variance case, or any explanation of what a variance is.

Perhaps this is because what they actually proffer is not a variance argument, but

---

[5] *Cf. Westbrook*, 119 F.3d at 1190 (rejecting argument that dealer acted independently because evidence allowed inference of involvement in conspiracy).

[6] *See United States v. Davis*, 61 F.3d 291, 297 (5th Cir. 1995) ("It is well-settled that credibility determinations are the sole province of the jury."); *see also United States v. Payne*, 99 F.3d 1273, 1278 (5th Cir. 1996) ("[N]on-credibility is generally not a sound basis for alleging sufficiency of the evidence; it is the jury's function to determine credibility.").

an elaboration of their challenge to the sufficiency of the evidence. They expand on the argument mentioned above that the government failed to prove a single conspiracy, and that the evidence supports multiple conspiracies, if any. The essence of the argument is that the dealers here acted independently, without any of the interdependence required of a single conspiracy that links them together. Regardless, we treat it as a variance argument and reject the challenge.

To obtain reversal of a conviction because of a variance between the indictment and the proof at trial, the defendants must establish (1) a variance between the indictment and the proof at trial (2) that affected their substantial rights. *See United States v. Morris*, 46 F.3d 410, 414 (5th Cir. 1995). The analysis of whether a variance exists essentially follows a sufficiency of the evidence inquirySSwe must determine whether the government proved a single conspiracy at trial. The principal factors we examine when we count conspiracies are (1) the existence of a common goal, (2) the nature of the scheme, and (3) the overlapping of the participants in the various dealings. *See id*. at 415; *United States v. Maceo*, 947 F.2d 1191, 1196 (5th Cir. 1991). As with a sufficiency of the evidence challenge, we affirm the conviction of a single conspiracy unless the evidence and all reasonable inferences drawn therefrom, examined in the light most favorable to the verdict, preclude finding a single conspiracy beyond a reasonable doubt. *Morris*, 46 F.3d at 415.

If we find a variance, we still do not reverse unless it affected the defendants' substantial rights, *i.e.*, prejudiced them. This includes a failure to give adequate notice to the defendants, and possible transference of guilt from co-defendants. *See id*. at 417.

### 1.

The heart of the defendants' complaint is that the government attempted and failed to prove a "wheel conspiracy." They emphasize that "there was no interaction between the supposed conspirators who form the spokes of

the wheel." As in *United States v. Levine*, 546 F.2d 658 (5th Cir. 1997), the case they cite, the government may have established spokes, but "the conspiracy lacks the rim of the wheel to enclose the spokes." *Id*. at 663 (internal quotation omitted). Even if the dealers had a common supplier, they did not interact with each other; there was no interdependence.

The first factorSScommon goalSSgenerally does not present a challenging factor for the government. We have adopted an expansive notion of a common purpose. *Morris*, 46 F.3d at 415. Indeed, "the common objectives test may have become a mere matter of semantics." *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987). We have held that the goal of selling cocaine for profit meets the common goal requirement. *See Morris*, 46 F.3d at 415; *Maceo*, 947 F.2d at 1196.

The defendants rely on *United States v. Glinton*, 154 F.3d 1245 (11th Cir. 1998), in which the court held that the government had not proved one over-arching conspiracy because all the defendants had in common was their supplier, who furnished cocaine to independent buyers. *See id*. at 1251. This does not attack the common goal requirement. The court even recognized the "common goal, to wit: profit from the sale of cocaine." *Id*. Rather, the *Glinton* court expressed concern with the lack of "overlapping connection," *id*.; this we address in our second and third factors.

Second, we must examine the nature of the scheme. The government rightly points out that we have moved away from such artificial constructs as "wheel" conspiracies.[7] Rather, we take a more functional approach. We must conclude that a jury could find the nature of the scheme supports a single

---

[7] "Conspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains or any one or all of today's galaxy of mechanical molecular or atomic forms." *United States v. Perez*, 489 F.2d 51, 59 n.11 (5th Cir. 1973).

conspiracy if "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture." *Maceo*, 947 F.2d at 1197 (quoting *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989)).

Patterson could not have kept supplying if the dealers did not distribute the cocaine base; the distributors could not have sold cocaine if Patterson did not supply it; and neither Patterson nor the next-level distributors could have sold the cocaine if their buyers did not purchase it.[8] The jury could have inferred that the tacit agreement among the dealers to borrow crack from each other when needed was an essential part of this distribution network, and necessary to keep it functioning. Furthermore, the myriad channels of distribution for Patterson certainly were advantageous to the overall scheme.

Third, we address whether the participants overlapped. Patterson and Adkism adamantly insist that the dealers acted independently of each other. But "[a] single conspiracy does not require every member to participate in every transaction." *DeVarona*, 872 F.2d at 119. In fact, a pyramid scheme, with a common supplier on top, is a common form of conspiracy of which we have approved. *See Morris*, 46 F.3d at 416; *Maceo*, 947 F.2d at 1197. Substantial evidence supports that Patterson provided crack cocaine to numerous dealers. Here, we have the added interdependence and overlap of the various dealers tacitly agreeing to supply each other with cocaine base when they ran short and needed some. True, some of the conspirators may have acted independently at times; but that does not preclude the jury's finding of single conspiracy.[9] We find no

variance between the indictment and the proof at trial.

### 2.

Even if we did find a variance, Patterson and Adkism have not even attempted to demonstrate prejudice from it. Nor could they. The indictment itself made clear the scheme on which the government relied, providing adequate notice. The testimony the defendants elicited from co-conspirators that they acted independently demonstrates that the defendants knew the government's theory and defended against it accordingly.

They make no attempt, and would not be able, to demonstrate prejudice from improper transference of guilt. "[W]here the indictment alleges a single conspiracy and the evidence established each defendant's participation in at least one conspiracy a defendant's substantial rights are affected only if the defendant can establish reversible error under general principles of joinder and severance." *Morris*, 46 F.3d at 417 (quoting *United States v. Jensen*, 41 F.3d 946, 956 (5th Cir. 1994)). The government established at least one conspiracy involving each defendant, with Patterson supplying crack cocaine to some other distributor who then either sold it or distributed it to yet another dealer. Thus, the defendants need to show reversible error under joinder and severance principlesSSa difficult task, given the court's discretion, even when briefed and argued. We find no prejudice.

### D.

---

[8] *Cf. Morris*, 46 F.3d at 416 ("If the sellers discontinued selling, there would be no cocaine for . . . the purchasers to buy . . . . Likewise, the distribution effort is critical to the success of the suppliers.").

[9] *See United States v. Hass*, 150 F.3d 443, (continued...)

---

(...continued)
448 (5th Cir. 1998) ("While . . . some of the participants in the conspiracy may have acted independently at times, this does not serve a fatal blow to the overarching conspiracy.").

Patterson contends that there is insufficient evidence to support his conviction for possession of crack cocaine with intent to distribute, in violation of 21 U.S.C. § 841, and aiding and abetting the same, pursuant to 18 U.S.C. § 2. As explained in more detail in part III.B.1., *supra*, when defendants fail to renew their motion for a judgment of acquittal at the end of their case, we review a sufficiency of the evidence challenge only for manifest miscarriage of justice. *See Inocencio*, 40 F.3d at 724.

### 1.

To obtain a conviction of possession with intent to distribute, the government must prove that the defendant (1) knowingly (2) possessed a controlled substance (3) with the intent to distribute it.[10] To establish that a defendant aided and abetted an offense, the government must establish that he associated with the criminal activity, participated in it, and acted to help it succeed. *Id*. Patterson does not challenge any particular element of the offenses, but rather raises a general challenge to whether the evidence links him to the crime.

### 2.

The government presented sufficient evidence supporting its theory that Patterson delivered nearly a kilo of crack to Thomas, who in turn sold it to Crawford and Block. This suffices to establish, at the least, aiding and abetting; indeed, the transaction would not have been possible if Patterson had not supplied the crack.

That the deal took place is well established. Thomas testified that he obtained the kilo from Patterson, as he always did. Hooker testified that Patterson and Thomas met before the deal and that he saw Patterson sitting in his car at the Razzmatazz while the

deal took place. Patterson told Hooker that Thomas would return shortly; from Patterson's apparent knowledge of when Thomas would return and the fact that he was sitting in his car, the jury could infer that Patterson knew what Thomas was doing and was waiting for the proceeds of the sale. The record is not devoid of evidence, and evidence supporting each element is far from tenuous.

### E.

Patterson also argues that the district court erred in admitting an alleged hearsay statement of a co-conspirator pursuant to FED. R. EVID. 801(d)(2)(E). The prosecution asked Hooker who supplied Thomas with drugs. The defense objected. The court required evidence supporting the co-conspirator hearsay exception before it would allow the testimony.

After Thomas had testified regarding a conspiracy, the court held that a conspiracy existed and that the statements Thomas made to Hooker were in furtherance thereof. Hooker then testified that Thomas told him Patterson was his supplier and that Thomas always had plenty of dope after Patterson visited. He also relayed Thomas's statement that he was going to ask Patterson the price for a kilo deal, and that Thomas wanted Hooker to stage a hit to make Patterson think Thomas had been robbed of the cash.

### 1.

Rule 801(d)(2)(E) provides that a statement made by a co-conspirator during the course of, and in furtherance of, a conspiracy is not hearsay and may be admitted. *See* FED. R. EVID. 801(d)(2)(E); *United States v. El-Zoubi*, 993 F.2d 442, 446 (5th Cir. 1993). Before admitting the testimony, "the court must determine by a preponderance of the evidence (1) that there was a conspiracy involving the declarant and the [defendant], and (2) that the statement was made 'during the course and in furtherance of the conspiracy.'" *Burton*, 126 F.3d at 671 (quoting *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). We review evidentiary

---

[10] *See United States v. Delagarza-Villarreal*, 141 F.3d 133, 140 (5th Cir. 1997); *United States v. Gonzales*, 121 F.3d 928, 936 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 726, and *cert. denied*, 118 S. Ct. 1084 (1998).

rulings for abuse of discretion.[11] The court's findings that a statement was made by a co-conspirator, during and in furtherance of the conspiracy, are findings of fact that we review for clear error.[12]

The record reveals that our review imposes an even greater burden on the appellants. When a party objects to the admission of evidence, the objection must be specific. "A sufficiently specific objection is necessary at trial so that testimony could be taken, and argument received, on that issue; and so that the district court would have dealt with it." *Burton*, 126 F.3d at 671.

In the context of evidence the government proffers under FED. R. EVID. 801(d)(2)(E), a general objection to the statement as hearsay, or as not falling under that rule, does not suffice to preserve the error of the statement not furthering the conspiracy for appeal. *See id*. at 672-73. Rule 801(d)(2)(E) contains four possible bases for objection: (1) that the declarant was not a co-conspirator, (2) that the party against whom the statement was offered was not a co-conspirator, (3) that the statement was not made in the course of the conspiracy, and (4) that the statement was not in furtherance of the conspiracy. *Id*. at 673.

The defendants made the general objection, "That's hearsay." They did not specifically raise the "in furtherance of" issue, and the record was not developed on that particular point; we review for plain error. To reverse, we must find (1) an error (2) that is plain and (3) that affects substantial rights, *i.e.*, affected the outcome of the trial, and (4) even if these are true, we exercise our discretion to correct the error only if it seriously affects the

fairness, integrity, or public reputation of judicial proceedings. *See id.* at 674; *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc).

2.

Patterson argues that the statement Thomas made to Hooker implicating him as the supplier of the kilo was not made in furtherance of the conspiracy, but "in furtherance of a scheme directly opposite" to the conspiracy, *i.e.*, to induce Hooker to help Thomas rob the supplier.[13] The government replies that the conspiracy's object was for the conspirators, including Patterson, Adkism, Hooker and Thomas, to sell crack for a profit. It does not matter who profited from the sale or that the conspirators may have turned on each other.

"A statement is made in furtherance of the conspiracy if it advances the ultimate objectives of the conspiracy."[14] We frequently have stated that "'in furtherance of a conspiracy' is not to be construed too strictly lest the purpose of the exception be defeated."[15] And we consistently have shunned an overly literal interpretation of the phrase. *See Burton*, 126 F.3d at 674; *Broussard*, 80 F.3d at 1039.

We have found a statement to be in

---

[11] *See United States v. Williams*, 132 F.3d 1055, 1059 (5th Cir. 1998); *United States v. Fike*, 82 F.3d 1315, 1329 (5th Cir. 1996), *cert. denied*, 520 U.S. 1131 (1997).

[12] *See United States v. Broussard*, 80 F.3d 1025, 1039 (5th Cir. 1996); *United States v. Stephens*, 964 F.2d 424, 434 (5th Cir. 1992).

[13] Hooker also testified more generally that he frequently received crack from Thomas, that Thomas told him Patterson was his supplier, and that Thomas always had plenty of crack cocaine after Patterson visited. On appeal, the parties focus on the statements related to the kilo deal. They do not present arguments related to this general testimony from earlier events, and we find no error in admitting it.

[14] *United States v. Snyder*, 930 F.2d 1090, 1095 (5th Cir. 1991) (citing *United States v. Lechuga*, 888 F.2d 1472, 1479 (5th Cir. 1989)); *see also ElZoubi*, 993 F.2d at 446 (finding statement not in furtherance of conspiracy because statement did not make conspiracy "more likely to succeed").

[15] *Broussard*, 80 F.3d at 1039 (citing *Lechuga*, 888 F.2d at 1480); *see also, e.g.*, *Burton*, 126 F.3d at 674; *Stephens*, 964 F.2d at 434; *Snyder*, 930 F.2d at 1095.

furtherance of a conspiracy when it identifies the role of a co-conspirator to someone who may need to know that role, or to allay suspicions or concerns.[16] Similarly, an identification furthers the conspiracy if it is puffing, boasts, or is other conversation designed to obtain the confidence of someone who is a member of, or dealing with, the conspiracy. *See United States v. Johnson*, 872 F.2d 612, 623 (5th Cir. 1989); *Miller*, 664 F.2d at 98. Statements also further a conspiracy when they contain information that facilitates the conspiracy's operations, *see Snyder*, 930 F.2d at 1095, protect and conceal a conspiracy, *see Broussard*, 80 F.3d at 1039, or are intended to affect future dealings between the parties, *see United States v. Patton*, 594 F.2d 444, 447 (5th Cir. 1979).

3.

The district court plainly erred in admitting Hooker's testimony related to the source of the kilo for the final deal.[17] The relevant conspiracy on which the government relies is the indicted conspiracySSthe one between Patterson and others to bring crack cocaine into the city and sell it at a profit through various mid-level dealers.[18] In

context, the identification of Patterson did nothing to advance that conspiracy. It did not provide information necessary or even incidental to the conspiracy's functioning. It was not meant to allay suspicions or promote confidence in the conspiracy.

Thomas identified Patterson as his supplier as part of his own scheme to rob Patterson. It simply cannot be that the statement furthered the conspiracy to distribute crack cocaine. It may be, as the government contends, that "[i]t mattered not who profited from the sale of illegal drugs or that there was no honor among drug dealers." But the statement advanced a scheme that had an objective opposed to, or at least in tension with, the usual conspiracy by which Patterson distributed drugs through mid-level dealers.[19]

4.

Because the court plainly erred in finding the statement in furtherance of the conspiracy, and hence abused its discretion in admitting the testimony, we must address the third step of plain error review: whether the error affected substantial rights. We look for prejudice to the defendant by performing a harmless error analysis, as we would for any erroneous evidentiary admission. *See El-Zoubi*, 993 F.2d at 446; *Means*, 695 F.2d at 818. We find the admission of hearsay evidence harmless if, after considering the other evidence in the case, we decide it did not actually contribute to, *i.e.*, have a substantial impact on, the verdict. *See El-Zoubi*,

---

[16] *See Lechuga*, 888 F.2d at 1472; *United States v. Lindell*, 881 F.2d 1313, 1320 (5th Cir. 1989); *United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987); *United States v. Miller*, 664 F.2d 94, 98 (5th Cir. 1981); *United States v. James*, 510 F.2d 546, 549-50 (5th Cir. 1975).

[17] *See United States v. Olano*, 507 U.S. 725, 734 (1993) (holding that an error is plain if it is "clear" or "obvious" under current law); *Calverley*, 37 F.3d at 162-64 (same).

[18] This need not be the case. The government can rely on a different conspiracy between the declarant and the defendant from the one for which the defendant is indicted. *See United States v. Narviz-Guerra*, 148 F.3d 530, 536 n.2 (5th Cir.), *cert. denied*, 119 S. Ct. 601 (1998); *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993). But, as will be explained, the only conspiracy that the identification of Patterson as the supplier might further is a conspiracy between Thomas and Hook to rob Patterson. Patterson is not a member of that conspiracySShe is the victim; the statement did not further a conspiracy involving
(continued...)

(...continued)
Patterson.

[19] *Cf. El-Zoubi*, 993 F.2d 442 (holding statement not in furtherance of conspiracy because inference could not be made that declarant thought conspiracy would be more likely to succeed by identifying the co-conspirator); *United States v. McConnell*, 988 F.2d 530, 533 (5th Cir. 1993) (holding court abused discretion in admitting statement because government laid no predicate that statement advanced conspiracy's objectives); *United States v. Means*, 695 F.2d 811, 818 (5th Cir. 1983) (holding statement inadmissible as "mere idle chatter" because record in no way indicated it was intended to further the scheme).

993 F.2d at 446.

With respect to the conspiracy count, ample evidence supports Patterson's link to the conspiracy, and the hearsay's admission is harmless. Patterson's possession with intent to distribute count presents a closer case. The only other direct evidence that he supplied the crack is Thomas's testimony. Thomas faces credibility problems, because he is testifying under a plea bargain. It is possible that the jury would not have been as quick to believe him if Hooker had not corroborated the testimony.

Nonetheless, Hooker's testimony is cumulative of Thomas's. "As long as it is not factually insubstantial or incredible, the uncorroborated testimony of a co-conspirator, even one who has chosen to cooperate with the government in exchange for non-prosecution or leniency, may be constitutionally sufficient evidence to convict." *Westbrook*, 119 F.3d at 1190. In addition, Hooker's testimony that Patterson had supplied Thomas on other occasions, that Patterson had met with Thomas earlier that day, and that he saw Patterson, apparently waiting in his car, while the deal was going down and that Patterson knew when Thomas would return, implying he knew of his whereabouts, substantiate Thomas's testimony that he received the kilo from Patterson. The error is harmless.[20]

F.

The defendants contend that the district court abused its discretion in admitting a tape recording of a drug transaction (the sale of a Big 8 among Block, Green, and John Fisher) because the tape bears no relevance to the defendants and, even if relevant, it should have been excluded under FED. R. EVID. 403. We review evidentiary decisions for abuse of discretion. *See Williams*, 132 F.3d at 1059; *Fike*, 82 F.3d at 1329. Because the defense objected only on relevance grounds, not on the ground urged on appeal, we review only for plain error. *See United States v. Cantu*, 167 F.3d 198, 204 (5th Cir. 1999).[21]

The court did not abuse its discretion in finding the evidence relevant. Rule 401, FED. R. EVID., provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable . . . than it would be without the evidence." The tape recording revealed a transaction that the grand jury included as Overt Act No. 29 of its conspiracy charge. That makes the tape relevant to establishing the conspiracy in which Adkism and Patterson were charged with participating.

Nor did the district court plainly err in not excluding the tape pursuant to rule 403, which allows the court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." As we have explained,

---

[20] Even if we found the error prejudiced the defendants, we would not reverse, for the error will not seriously affect the fairness, integrity, or public reputation of judicial proceedings. Although the harmless error analysis may be close, that closeness weighs against reversing under this fourth plain-error step. In addition, Patterson, as a member of the conspiracy, could have been convicted of possession with intent to distribute under the *Pinkerton* doctrine. *See United States v. Narviz-Guerra*, 148 F.3d 530, 535 (5th Cir. 1998) ("A party to a conspiracy may be held responsible for a substantive offense that a co-conspirator commits in furtherance of the conspiracy even if the party did not participate in or have any knowledge of that offense. *Pinkerton v. United States*, 328 U.S. 640, 647 [] (1946). Thus, once the conspiracy and the defendant's knowing participation therein is [*sic*] proved beyond a reasonable doubt, a (continued...)

(...continued)
defendant is guilty of the substantive acts his partners committed in furtherance of the conspiracy."). This, too, weighs against finding the error affected the fairness, integrity, or public reputation of judicial proceedings.

[21] *Accord United States v. Johnson*, 722 F.2d 407, 409 (8th Cir. 1983) (holding that, because defendant had objected to evidence below only on grounds of relevance, court would review hearsay objection for plain error).

> Relevant evidence is inherently prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403. Unless trials are to be conducted on scenarios, on unreal facts tailored and sanitized for the occasion, the application of Rule 403 must be cautious and sparing.

*United States v. Hall*, 152 F.3d 381, 401 (5th Cir. 1998) (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979)).

The defendants offer no reason, beyond bare assertion, why this evidence should be excluded under rule 403. The tape, reflecting two co-conspirators negotiating with Block, is highly probative of the existence of a conspiracy. Furthermore, Block testified that he used this taped transaction as a step toward the next purchaseSSthe kilo deal. Green, who appears on the tape, then set up the kilo deal through Thomas; and through Thomas we learn that he was supplied by Patterson.

Nothing appears unfairly prejudicial, misleading, or confusing. The defendants' generic claim under rule 403 must fail, and the district court did not plainly err in admitting the evidence.

AFFIRMED.